We'll hear argument, we'll continue argument, in Case 22-535, Department of Education v. Brown. Welcome back. Thank you, Mr. Chief Justice, and may it please the Court. Across the board, Brown and Taylor's arguments in this case run counter to precedent and principle. On standing, respondents asserted injury is a complete mismatch for the release they seek. They claim to want greater loan forgiveness than the plan provides, but they ask this Court to hold that the HEROES Act doesn't authorize loan forgiveness at all. A win on that theory would mean that no one could get any HEROES Act relief, not Brown, who would get nothing for herself, not Taylor, who would lose $10,000, and not any of the millions of borrowers who need this critical relief. Respondents lack standing to seek that result. Parties cannot go to court to make themselves and everyone else worse off. To get around that problem, Brown and Taylor gesture at the idea that if the Secretary can't act under the HEROES Act, he might consider making an entirely different decision to grant debt relief under the Education Act. But on the merits, respondents are broadly attacking the whole idea of providing loan forgiveness under any executive action. They never explain why they think the Secretary could provide broader relief to even more borrowers under the Education Act. And in any event, this Court has never endorsed that kind of circuitous route to standing. A plaintiff who isn't injured by agency action can't establish standing by speculating that invalidating that action might prompt the agency to take an entirely different action under a different statute. If the Court reaches the merits, it should reject respondents' claim. They argue the plan is unlawful because the Secretary didn't use certain rulemaking procedures. But Congress specifically exempted the Secretary from following those procedures when he issues waivers and modifications under the HEROES Act. Respondents' procedural claim fails in light of that clear statutory exemption. I welcome the Court's questions. Are there any instances in which you would have procedural standing? So I think that if they wanted to argue that the Secretary should have reconsidered his decision under the HEROES Act to grant broader relief, then it's possible that they could have raised both a procedural claim and a substantive claim, because at that point their injury would be redressable. They would be saying that the Secretary drew arbitrary lines, that the plan should be expanded to include them and to provide relief to them, and that would be a very straightforward route to making the argument if what they really want is loan forgiveness. But instead, their whole argument here is that the Secretary can't give them or anyone else relief under the HEROES Act, and when you look at it that way, there is no case that we've been able to find, and we've really tried to boil the oceans here, that could plausibly support that theory of procedural injury. It would blow open the doors to asserting Article III injury when you are not directly affected by an agency action, and by your own life, you can't stand to benefit from any ruling on that agency action, merely because you think that if you can block it, the agency might reach out and look for some other source of authority to regulate and make a new action. This action has nothing to do with their right, if they thought it was permissible, to seek relief under the Education Act, correct? That's correct. It's a totally different source of authority. If they want relief under the Education Act, there are provisions where they can file a petition for rulemaking and ask for that relief right now. And it's not as though these are mutually exclusive sources of authority. The Education Act is not directed to national emergencies, it's an independent source of authority here, unlike the HEROES Act, which is the action they're challenging that's specifically focused on this national emergency situation. I understand your argument on standing, and I know this isn't directly on point, but it's sort of like the equal protection cases, you know, where discrimination between men and women on the level of pensions, and the widows get more and the widowers get less, and the challenge is brought, and the argument was, well, if you win, we're going to take the excess away from the widows, so you're not going to get anything, so you don't have standing. Why is that case, I appreciate the way in which it's different, but why isn't that at least some authority on which they can rely? I think that the equal protection cases are fundamentally different, because there, your injury is your complaint of unequal treatment. And so, whether you level up or level down, your injury is being redressed. You're no longer being subject to unequal treatment, and instead, everyone is being subject to the same treatment. But this case stands in a very different posture, because here, their argument is, our injury is we're not getting loan forgiveness, and the relief they're seeking, which is a declaration that the HEROES Act doesn't authorize loan forgiveness in the first place, doesn't redress that injury one bit. It just carves it into stone. Right, but I mean, without looking after the case, yes, you could lower it or raise it, but that's an uncertainty that we decided that that did not affect their right to bring the action, because it may be changed in a particular way. And I suppose their argument would be that, you know, they are injured by not participating in the program, and if the program is struck down in its current form, it may be changed in a particular way that would help them. So I think that there is, though, a complete disconnect between the claim of injury, and it's true that in the equal protection context, you don't know ex ante what the remedy is going to be, but the court has determined that doesn't affect standing, because either way, no matter what remedy occurs based on the equal protection injury, it's going to fix the nature of the harm of providing unequal treatment. And here, the only certainty is that if they prevail on their claims, it's going to make it harder to provide them or anyone else with that relief. Their suggestion here that the Secretary wholly lacks this authority under the HEROES Act, and their assertion of arguments to support that claim that broadly attack this whole concept of loan forgiveness, I think demonstrate that we're far afield from the equal protection case law. Can I just ask you, I'd understood them to be complaining about the procedures. Am I completely off base here? You suggested that they were complaining about not getting enough loan forgiveness or something. Maybe I misheard you, but I thought they were trying to bring a procedural claim, and that the reason why this was problematic was because the procedures that they are saying are lacking are actually under the other source of authority. That if we looked at the source of authority that the Secretary used in this scenario, it doesn't guarantee them those procedures. So you can't really complain about not getting procedures under another statute that was not invoked in this situation. Am I wrong about this? No, and I understand the confusion, because the theory here is a little convoluted. And so let me try to unpack it. They are asserting a procedural injury. But what they're saying is we want an opportunity to comment on loan forgiveness, so it will include us as well. Our underlying injury is that without having a chance to comment on the Secretary's use of authority under the HEROES Act, we didn't get a chance to advocate for us to be included in the plan. The problem with that procedural theory of harm is that by their own arguments in the case, the Secretary couldn't make a different decision. He couldn't go back to the drawing board and think about it and decide, yes, I'm going to expand the plan under the HEROES Act to provide these borrowers with relief, too. So they aren't able to assert that kind of redressability for an asserted procedural injury under the HEROES Act. And that's because there aren't negotiated procedures under the HEROES Act. Right. The statutory text is very clear. So even if you were to get to it on the merits, they haven't actually been deprived of any procedural rights. The HEROES Act specifies that waivers and modifications issued under the HEROES Act are exempt from notice and comment. But I think because of the fundamental flaw with their theory of injury and the fact that it couldn't be redressed by their own arguments in this case, they've now brought up this Education Act idea. They haven't been deprived of any procedural rights under the Education Act. You know, procedural rights derive from specific agency decisions under agency authority. So it's not as though they have some procedural right in the ESER to just comment on the concept of loan forgiveness writ large. Instead, under the HEROES Act, as we've just discussed, there isn't a notice and comment procedural right. And under the Education Act, no decision has been made. And so they haven't been deprived of any procedure associated with that decision making. So what they would need, I suppose, is certainty that if we nullify the authority of the secretary to do what it did in the HEROES Act, that there would necessarily be a loan forgiveness program under the HEA. Yes, and they can't make anything like that showing here. It's total speculation on their part to suggest that if the secretary is blocked from taking this action, maybe he'll look for a different source of authority and issue an entirely different program under that source of authority. And I think that that shows that their theory is unduly speculative here. I think it's important to recognize as well why they're pressing this claim and the upshot of this theory. The reason they're asking the court to go down this road is so that they can effectively raise a substantive challenge to the HEROES Act. That was actually the only claim on which they prevailed below. The district court in this case rejected their assertions of procedural harm and instead went on to resolve a standalone substantive challenge to the secretary's plan and said that it was unlawful under the HEROES Act. But they've now entirely abandoned that basis for prevailing below. They say that the district court was wrong to consider that. They're not defending that ruling. And it makes good sense because they obviously lack standing to maintain a substantive standalone challenge to the HEROES Act since that wouldn't do anything to redress their harm, but instead just ensure that they aren't going to get any debt relief. By raising this procedural argument, though, they're effectively asking for an opportunity to raise the very same substantive claim that they lack standing to pursue through the guise of a procedural challenge to the Act. And there is no apparent reason for the court to allow that kind of gambit and to take what is actually a substantive challenge based on a generalized grievance with how the executive is administering the law and alter the ordinary Article III standards to allow a plaintiff to revisit that conclusion through a procedural mechanism. General, I appreciate your standing arguments. And they've been laid out very clearly here. An interesting feature of this particular case, as you well know, is that the court entered a universal decree. We've chatted about this in prior cases. We have indeed, Justice Gorsuch. And I just wanted to give you another chance to talk about universal vacature with some of my friends here. If you want it. And if you don't, that's fine. I will always take that opportunity. We did argue below that the district court didn't have authority to enter universal vacature in this case. And the language that courts have relied upon in thinking that this is a permissible remedy under the APA. For a handful of plaintiffs. Yes. For two individual borrowers is the set-aside language. But as we've explained, that language, which comes from Section 706 of the APA, if you look back and trace through what Congress was doing when it enacted the APA, was not meant to be the remedial provision of the APA. Instead, that comes from Section 703, which tells you to either look at a special statutory review provision if one exists. And sometimes there are special statutory review provisions that say you can operate directly on the agency action at issue. But in the absence of that, then it's the traditional equitable remedies that predated the APA. And there was nothing like this universal vacature remedy then, which would take you far beyond party-specific relief. I mean, talk about ways in which courts can interfere with the processes of government. Through two individuals in one state who don't like the program can seek and obtain a universal relief, barring it for anybody anywhere. That's right. For millions of Americans, they've been able, on the basis of this claim, to hold up that critical relief. But of course, if they actually had standing to do that, then, you know, they could bring such a claim. And I guess your position, which is not in this case, because we don't have a question presented about universal vacature, but your position is that, what, the court doesn't have the ability to issue an injunction that would prevent this plan from operating just because it was two people who brought the claim originally? Well, to be clear, we're not suggesting that injunctions would be off the table, but those, too, would have to be targeted to party-specific relief. And how would it be targeted in a plan such as this? So, for example, if, in fact, they had standing to pursue a procedural right, then the secretary would be enjoined to provide them the process that's due, and to take into account their views in determining whether to expand eligibility under the program. But nothing about that, Justice Jackson, would in any way call into question whether other people should get this right. I understand, but would you have the same reaction to universal vacature if the claim on the table was about their particular entitlement to getting, let's say, more money under this plan? Would we be in a world, if you were right, about universal vacature, in which every single borrower in the country would have to bring a lawsuit in order to vindicate a right that the court would say these two people have? Well, I think in a situation, it depends a little bit on which court you're talking about. Obviously, this court has the authority to resolve issues like that for the entire nation, so if a question makes its way to this court, then it wouldn't be necessary to have follow-on suits. In the absence of that, then, yes, our argument is you should provide party-specific relief, that the traditional concepts of remedial authority under Article III were limited in that way, and that to instead allow single-district courts throughout the nation to claim the power to put a critical policy on hold is out of accord. The last time we did this, every member of the D.C. Circuit... This is going to take a while. We can go into this, but... So I'm just going to change the subject. General, I'm sorry. No, I have a question. There are many former members of the D.C. Circuit. I'd like to hear about the merits of this case. I want to come back to some of the claims that both sets of respondents here have in common dealing with what we've called the arbitrary and capricious aspects of the case. And as I understand it, the memorandum really talks about two things. It talks about forbearance, and it talks about sort of economic-slash-COVID conditions. Forbearance is a kind of separate thing, that people who have been granted forbearance for long periods of time are more likely to go into default or become delinquent in their payments. And I guess I wonder, is that about COVID, or is that just about something that happens when you excuse loan payments for a long period of time, and how it is that that gets to be converted into an emergency COVID rationale? And then on the economic considerations, and I think it was Justice Barrett who talked about this a little, it seems a real mixture of COVID and non-COVID-related things. Of course, this is how the economy works, that COVID interacts with other features of the economy to produce certain economic conditions. But again, I'm wondering whether, you know, there was more of an obligation on the part of the Secretary to isolate how COVID was affecting these borrowers. Of course, and I'll take each of those considerations in turn. I'll start with your questions about forbearance. And I want to be really clear, because I think my friends have confused the issue about this a little bit. But the Secretary wasn't finding that forbearance itself had caused that economic harm to borrowers, or that it was the root cause of why they needed additional relief. Instead, the Secretary analyzed the historical data regarding forbearance as a data point in understanding that forbearance is not always the complete solution to the underlying economic harm caused by the national emergency. So here, there's no doubt that forbearance has provided very powerful and critical support to borrowers over the life of the COVID pandemic. But the Secretary found that once forbearance policy lifts, millions and millions of borrowers are going to be worse off with respect to their ability to pay because of COVID. The forbearance policy hasn't fixed the underlying economic harm of the pandemic and the emergency. So to the extent that there's a bootstrapping concern here, I just want to push back forcefully on that. I think that the Secretary's decision memorandum makes clear that sometimes additional relief is necessary, not because of forbearance, but in spite of forbearance. To turn to your question about the various causes or influences of economic harm here, it's of course true that I can't make a representation that the harms that borrowers are facing are solely due to COVID-19. But I think that it would be an impossible burden to place on the Secretary to suggest that he needs to isolate and identify just one economic factor or force that's causing that kind of distress for borrowers. Our economy is very complex, and there are often multiple factors and forces at play, but the Secretary here found, and I don't think that anyone could reasonably dispute, that but for COVID, borrowers would not be in this situation of facing severe financial harms and the very real risk is they'll have to go into default or delinquency when they start repaying their student loans. So I think to the extent that there's concern here about how the standard could operate, at the very least, the Secretary made the requisite findings that these are financial harms that derive directly from and are but for a result of the COVID pandemic. Counsel, I'm sure I'm misreading the graphs. I'm looking at 247, 248. Didn't half the borrowers say they would not have any trouble paying their loans without regard to the forgiveness program? So it varies based on income bracket. And yes, it's true that in certain income brackets, the data, I think, reflected that, you know, 51% of borrowers expected that they would be unable to pay their student loans. That wasn't the only data the Secretary consulted, though. In those same studies that he referenced, there was general data about levels of financial insecurity and overwhelming majorities of borrowers expressed huge financial insecurity concerns about their ability to make ends meet going 10 years into the future. And I think one of the important things to recognize, again, as I had mentioned in the last argument, is that it's not necessary for the Secretary to make a finding that each and every borrower who receives relief under this plan would have necessarily gone into default or delinquency without it. No, of course not. But, I mean, it does kind of factor into the consideration, particularly in a situation where you don't have notice and comment of proceedings, that maybe, again, that's something that a broader representation of national interest in Congress would take into account rather than what the Secretary in a particular case, who's weighing a lot of options and considerations as well, would take into account. I mean, if more than half the people say they don't need this relief, extending relief to that breadth certainly raises questions. So let me be clear that I think there is an avenue to address those kinds of questions with over breadth. I don't think that it's a function of statutory interpretation, though. I think that would be applications of the statute to particular fact patterns and whether the Secretary could justify the lines he drew and the level of relief he decided was necessary. And here Secretary Cardona explained that huge numbers of borrowers were going to go into default and delinquency, and it's not as though he could easily segregate and say, here are the 50% where I know for sure it will happen, and here are the 50% where it won't. If he could make that kind of determination, it might provide a basis to determine that he should have drawn different lines. But we don't have anything like that here. And I would just point again to the forbearance policy. You know, that has applied across the board to every single student loan borrower with a federally held loan for the past three years. But I think that both Secretaries acted entirely within the domain of the HEROES Act in recognizing that that kind of broad class-wide relief was necessary due to the particular exigencies of this emergency. Thank you. Since we're dealing in a case with individual borrowers or would-be borrowers, I think it's appropriate to consider some of the fairness arguments. You know, you have two situations. Both two kids come out of high school. They can't afford college. One takes a loan, and the other says, well, I'm going to try my hand at setting up a lawn care service. And he takes out a bank loan for that. At the end of four years, we know statistically that the person with the college degree is going to do significantly financially better over the course of life than the person without. And then along comes the government and tells that person, you don't have to pay your loan. Nobody's telling the person who is trying to set up the lawn service business that he doesn't have to pay his loan. He still does, even though his tax dollars are going to support the forgiveness of a loan for the college graduate who's now going to make a lot more than him over the course of his lifetime. Now, it seems to me you may have views on fairness of that, and they don't count. I may have views on the fairness of that, and mine don't count. We'd like to usually leave situations of that sort when you're talking about spending the government's money, which is the taxpayer's money, to the people in charge of the money, which is Congress. Now, why isn't that a factor that should enter into our consideration under the major questions doctrine again, where we look at things a little more strictly than we might otherwise when we're talking about statutory grants of authority, to make sure that this is something that Congress would have contemplated? So, my reaction to that, Mr. Chief Justice, is that Congress did take those kinds of considerations into account in specifically providing this authority to the Secretary. I think that the same kinds of arguments about fairness... Well, it's just circular. It sort of begs the question to say that, first, I don't see any evidence that they took the person who's trying to start the lawn service because he can't afford college. I don't see any evidence that they took him into account. But if that's what Congress would need to take into account and show, then it can't legislate. It can't provide the executive with pre-authorization to take action into an emergency. Congress can't look ahead to the future and say, okay, in the year 2020, when an unprecedented global pandemic hits, we've decided that the lawn care professional should not benefit from this program, but the student... So, you're relying on an interpretation of the statutory authority to say that that's implementing Congress's intent to do that. In a pandemic that they couldn't have foreseen, we do think, you know, they would have foreseen the idea when they said a modifier waive, that that would mean waiving the whole liability for 40 million Americans at the cost of half a trillion dollars, that they foresaw that enough to allow the Secretary to act without any express congressional authority, any more express congressional authority than the authority you rely on. Well, let me break it apart into two different components, because I think there's a first-order question of whether Congress could have foreseen the possibility of debt discharge at all. And I think the answer to that has to be yes. That was a well-established form of relief that you can provide to borrowers in hardship situations, as I previously mentioned. It's one of the core provisions in the Title IV. And Congress, in specifically enacting a statute that's aimed at this problem of not leaving borrowers worse off in reaction to a national emergency, clearly understood that using the broad language. So that's the first-order question. I'm not faulting you for repeating your answer, since I think I probably repeated my question. But you're just saying it's the same argument about what modify and waive means. It is as a statutory matter on the categorical argument about debt discharge. Now, you have asked me several questions about the scope of this program, and let me try to be responsive to that. I recognize that this is a big program, but that's in direct reaction to the COVID-19 pandemic, which itself was a really big problem. There hasn't been a national emergency like this in the time that the HEROES Act has been on the books that's affected this many borrowers. And so I think it's not surprising to see, in response to this once-in-a-century pandemic, the kind of relief that the secretaries have offered here, the forbearance policy that has itself cost $150 billion, and now this loan forgiveness program. To the extent that you have concerns about the scope and size of the program, though, I would say that if I can get you to agree with me, and maybe I can't, on this point that the categorical debt discharge argument doesn't work as a statutory matter, then I think the right place to look to house those concerns is an arbitrary and capricious review. We think here that the secretary drew reasonable lines in crafting the scope of relief, but if you disagree or if you think he should have taken different interests into account, that would be a basis to reverse him on arbitrary and capricious grounds, not to distort the plain meaning of the HEROES Act. Thank you. Justice Alito? Well, the secretary did what he did, so presumably he had and has a view about the fairness question that the Chief Justice posed to you. What is that view? So the secretary understood the statutory authority and mandate here to focus on whether this national emergency was going to leave borrowers worse off because of the pandemic. This is Congress deciding that the government should be in a position to provide benefits solely within the context of the student loan program. And I don't think there's any part of the statutory analysis. This is Congress's judgment that borrowers should be able to get relief if the secretary makes these determinations, with no suggestion that the relief should turn on or off based on the possible impacts on those outside the student loan program. Congress obviously knew when it was giving this authority to take care of borrowers who are otherwise going to be worse off that that might have otherwise impacts outside the program, but it wanted to make sure the secretary could provide relief to borrowers. Was the secretary legally obligated to do what he did?  He decided to do what he did and must have had reasons for doing it, and some of them are on the record, some may not be. But if you're right, then the secretary presumably could do more. And therefore, I think it's a fair question to say, what is your client's view about the fairness question that some people have posed and that was reiterated for you by the chief justice? The view of the department is that this relief is warranted. Why is it fair? If he didn't have to do it, why is it in the answer to say that it was warranted? Maybe it was warranted, but why was it done? I guess you don't want to answer the question. It was fair because in the absence of this relief, it's undisputed that there are going to be millions of student loan borrowers who are not going to be able to pay their student loans into default and delinquency, and the HEROES Act was specifically designed for this situation. This is Congress telling the secretary, you don't have to let that happen. And when we have this kind of a pandemic that requires this kind of relief, I think that the HEROES Act is operating right within its domain. I'll try one more time. Why was it fair to the people who didn't get arguably comparable relief? It may be that their interests were outweighed by the interests of those who were benefited or they were somehow less deserving of solicitude, but what is your answer to that question? My answer to that question is that Congress has already made the judgment that when there is a national emergency that affects borrowers in this way, the secretary can provide relief, and you can make this critique of every prior exercise of HEROES Act authority. There, too, you could say, well, that only benefits the specific enumerated affected individuals, but it's Congress who defined those individuals, and the secretary acted properly here in giving them relief. Justice Sotomayor? I think the bottom line answer to be everybody suffered in the pandemic, but different people got different benefits because they qualified under different programs, correct? That's right. There's been enormous relief efforts. But there's inherent unfairness in society because we're not a society of unlimited resources. Every law has people who encompass it or people outside it, correct? That's correct. And that's not an issue of fairness. It's an issue of what the law protects or doesn't. Yes. Justice Kagan? I mean, Congress passed a statute that dealt with loan repayment for colleges, and it didn't pass a statute that dealt with loan repayment for lawn businesses. And so Congress made a choice, and that may have been the right choice or it may have been the wrong choice, but that's Congress's choice. And you're saying that the secretary implemented his powers under Congress's choice, which gave him authority over loan repayment. It definitely did not give him authority over loans for lawn care. That's correct. The secretary would have no authority to act outside the student loan program. The HEROES Act is specifically designed only to empower the secretary with respect to that portfolio. And maybe, as Justice Sotomayor said, Congress gave a different kind of authority to a different secretary with respect to a different set of activities when an emergency struck. Is that correct? Yes. Justice Gorsuch? I just wanted to make sure I understood your position with respect to some of the gnarly language in this statute, which is waive or modify affected individuals to ensure they're not placed in a worse position financially because of the COVID crisis. You'd agree that doesn't authorize the secretary to place persons in a better position than they were because of the COVID crisis? So I agree that the purpose is to ensure that they're not worse off, but I would disagree insofar as it's clear that he can provide class-wide relief. So if it turns out at the end of the day that some individuals are getting relief who, it turns out, wouldn't have needed it, Congress tolerated that and, in fact, encouraged the secretary to err on the side of the bar. So this statute is not just authorizing the secretary to place people in the same position that they were prior to an emergency, but to allow the secretary to place persons in a better position than they were prior to the emergency?  Let me try to clarify. His purpose has to be to ensure that they're not left worse off. But his effect can be. If the effect is that some individuals in the class receive relief who wouldn't otherwise need it, that doesn't mean that his plan is invalid. But if I could respond to your question about better off, worse off. Let me just, I'm sorry, let me pose a different question. So some persons can be better off is your position. I guess how many is my next question, right? Let's say two people in Missouri, okay. All right, they're better off. But what if it's 90% of the class, just hypothetically? Could the secretary do that under this statute? So I think the right way to analyze that would be under arbitrary and capricious review, because, as I've just explained, we think the statute tolerates some overbreadth. And so at that point, you would want to look at the secretary's justification for his action. It sounds to me like that could be unreasonable, that maybe he wouldn't be able to justify that particular line-drawing choice because it would be so extensive relief that isn't actually necessary. But one of the things you'd want to look at is whether there was a way to tailor it, whether there was a way to segregate the people who actually needed their relief or not. I understand that. And just in case you think this plan does that, Justice Gorsuch, it does not. I'm asking a hypothetical. And I understand your point you direct us to arbitrary and capricious review. With respect to the fairness question that the Chief Justice posed, would you direct us as well to maybe State Farm, for example, where the secretary has to weigh not just the benefits to the persons he's acting to favor, but also the cost to others? I think that that is a more natural way to analyze those issues. I should emphasize, because we're in this case, that the individual borrowers didn't raise a State Farm argument, so they're not making these fairness allegations. I hear you. But you'd agree that that would be a relevant consideration at some stage in a court's analysis of the secretary's action? I don't think that the secretary could be faulted for not considering the interest of non-student loan borrowers, because I don't think that's one of the relevant interests that Congress expected him to take into account under this authority. As we've been discussing laws all the time. So, no, it's just irrelevant? Yes. I think that his charge under the HEROES Act is to determine whether student loan borrowers need this relief. I appreciate it. Thank you. That's clarifying. Thank you. Justice Kavanaugh? To pick up on the Chief Justices' and Justice Alito's questions, if we're thinking about how to interpret the statute, and we're trying to think about the context of the statute in interpreting it, the word wave and isolation, one thing, the word, but it doesn't use cancellation, so that cuts the other way. I take your response to that. But then you're thinking about contextually how it all works, the fact that there will be winners and losers, big winners and big losers, relatively speaking, if the executive branch has this kind of authority. People who didn't go to college, as the Chief Justice said, or people who had just paid off their loans who say what they did to pay off their loans, and they're getting no relief because of the timing of the situation. And if Congress were doing this, Congress could and would, no doubt, try to hear about all that and factor all that in in a way that a secretary could not, especially without notice and comment. Should any of that factor into how we think about whether to give a broad reading to wave or a narrow reading to wave, given the context? No, I don't think that that should factor into how to interpret the statute. I think instead, as this court usually does, it needs to consider that text on its own terms, and I don't see any way to read the provision to wave or modify any Title IV provision to mean, but only do it a little bit, only in response to minor emergencies. It would actually be perverse to suggest that when there's a big emergency that might necessitate broader relief, the secretary is more disabled from acting. Instead, that's the language in the statute that's meant to empower the secretary and to ensure that he has whatever tools are necessary to fulfill the statutory purpose, to ensure that borrowers are not left worse off. With respect to these concerns about whether there's room to take into account other interests beyond student loan borrowers, there are avenues to go to Congress for additional relief to implement other programs. There's been unprecedented levels of COVID pandemic aid, as I mentioned, and I think to suggest that the secretary here should have told borrowers who he had determined were at massive risk of default and delinquency in record numbers that he wasn't going to use the authority under the HEROES Act that's tailor-made to prevent that result would have been an irresponsible thing to do. Again, I think that this really comes down to Congress's judgment that there should be authority to provide the benefit within the context of this program. Obviously, there are additional authorities and benefits that can be provided under other programs. Separate question, the student loan issue is a major public policy issue without regard to COVID to begin with, obviously, and how to deal with that and the burdens it's imposing on people after they get out of college who have massive student loans to pay back. Obviously, a huge public policy issue that was being considered before COVID. Should that factor in to how we think about this? In other words, this is something that was on the table being discussed, being debated, and then all of a sudden this public policy idea is attached that was being proposed and pursued before the pandemics attached to pandemic legislation. Matter at all? I think that it's really hard to think about how that should work as a matter of statutory interpretation and specifically what kind of burden this court would be putting on Congress if it goes down that road. If you put yourself back in the shoes of the 2003 Congress, it couldn't necessarily anticipate exactly what would be the subjects of political discussion and debate at the time that the COVID national emergency pandemic hit. Going down the road of suggesting the meaning of the statute could change or it should be interpreted in an atextual way because of current conditions, I think would basically disable Congress from being able to take the kind of action we have here of trying to ensure that the executive can act quickly with preauthorization in an emergency to force all massive student loan default. Last question. I can't resist on Justice Gorsuch's earlier question. If it were party-specific relief and it went up to the Court of Appeals and you had sought an emergency injunction in the Court of Appeals and the Court of Appeals ruled against the government on that, would you then follow that in that circuit or not? I think it's a practical matter. We generally do follow that in the circuit. I want to be careful here because I— You might not in the future. You can admit it. Our general practice is yes. We treat it as binding within the relevant circuit. But again, the concern here is that actually it's imposing on us an obligation to follow it throughout the nation. And if you came up to this court in an emergency application and we said you did not have a likelihood of success, I think you said earlier you would follow that. Why would you follow that? We recognize that this court has authority to resolve these issues for the nation. Even though there are only two parties in the case, you would say we're going to follow it for everyone else to not force every other affected individual to come to court? Do you think every future administration will have that same approach? Well, I think that they would likewise understand that even if the release didn't formally extend beyond the parties in the case, obviously the precedential force of this court's decisions in a given area rule for the nation. Thank you. Justice Barrett? I want to ask you about universal vicature. I just want to ask you one thing about the statutory language, that I wonder whether it's an indication of the scope of waive or modify. So the secretary has authority to waive or modify to ensure that affected individuals are not placed in a worse position financially in relation to that financial assistance, so in relation to their debt. So you agree, right, that we're not talking about a worse financial position generally. We're just talking about in relationship to the debt. That's correct. The two often collapse, obviously, because if you are distressed financially, it might mean that you're having trouble paying your mortgage or paying your rent, buying your groceries, and paying your debt. But yes, the function of the HEROES Act focuses on your position with respect to your ability to repay your student loans. So it seems to me that that language in relation to that financial assistance suggests that the relationship would continue, but the waiver or modification here severed the relationship to the debt so that it no longer exists. So why would that be consistent? I mean, doesn't the statutory language in relation to that financial assistance presuppose an ongoing relationship that might be modified but not completely ended? No, I think that that would be reading in limitations that can't be gleaned from the text. What we understand the statute to be focusing on and specifically looking at the subparagraph here that justified this act, making sure that student loan borrowers are not worse off with respect to their loans, that functions as a matter of their probability of being able to actually make their payments. And this actually relates to some of the questions that Justice Gorsuch was asking about better off, worse off. Imagine a student loan borrower, for example, who before the pandemic had her affairs entirely in order. She had a 0% chance of defaulting on that debt. But then COVID hit. Her life has been disrupted. Her job was disrupted. Inflation is at record levels. She's having trouble making ends meet. And now she has a much higher likelihood of not being able to pay her student loans. In that situation, Heroes Act relief, if it were to operate even to completely eliminate her debt so she doesn't have an ongoing relationship with it, it would just restore her to her pre-pandemic relation insofar as her risk of default and delinquency. She was 0% before and now she'll be 0% after. And so it doesn't inherently make her better off within the meaning of the statute. Thank you. Justice Jackson? I just wanted to quickly circle back to the fairness point. I guess I'm wondering whether or not the same fairness issue would arise with respect to any federal benefit program. So I'm thinking about the fact that as a result of COVID, we had massive infusions of money given to various companies, organizations, clearly authorized because Congress said do it. I'm wondering whether that would be unfair to people who didn't own a company or somebody who didn't have a nonprofit and wasn't getting that money. I just don't know how far we can go with this notion of, to the extent that the government is providing much-needed assistance to people in an emergency, it's going to be unfair to those who don't get the same benefit. Yes, that's exactly right. And what I would say is that is inherently an aspect of what Congress authorized in the HEROES Act as well. It specifically thought about this situation, what to do about student loan borrowers who are impacted by a national emergency who might then end up in a worse position with respect to their ability to repay. And Congress made the judgment you can give them relief. And with any benefits program, there are going to be others outside the context of that particular program who aren't getting the benefit. But I don't see how that could possibly provide a basis to just say that you're paralyzed in doing what Congress intended to ensure that the class they were focused on gets the relief they need. Thank you, General. Mr. Connolly? Mr. Chief Justice, and may it please the Court, this case turns on the same issue as Nebraska v. Biden, whether the HEROES Act authorizes the debt forgiveness program. It does not, as this Court has already heard. I'd like to focus here on three issues specific to this case. First, the HEROES Act is the Secretary's only excuse for not adopting the program through negotiated rulemaking and notice and comment. If that act does not apply, there is no dispute that the program is procedurally improper. Second, on standing, the government makes one argument that if respondents prevail, the Secretary won't provide debt forgiveness to them under the HEROES Act. But that isn't the proper inquiry. Respondents need only show that there is some possibility that the relief they seek will prompt the Secretary to forgive their debts. On that question, there is no debate. Debt forgiveness is a top priority of this administration. The parties agree that the Secretary can forgive debts under the Higher Education Act, and the Secretary has never denied that he may follow the proper procedures and forgive respondents' debts after his current program is declared unlawful. Finally, on the merits, Congress did not authorize the Secretary to create a $400 billion debt forgiveness program behind closed doors with no public involvement. The whole point of negotiated rulemaking and notice and comment is that the individuals most affected by student loan regulations, like the respondents, must have a meaningful voice in the regulatory process. But here, the respondents were deprived of their procedural rights and their finances suffered. Brown got nothing, and Taylor received only $10,000, even though high-income individuals making more than five times as much got $20,000. The law requires that the Secretary give respondents an opportunity to be heard. The judgment below should be affirmed. Mr. Connolly, has this Court ever held that the notice and comment provisions of the APA can establish enough for standing in a case like this? Yeah, I would point to Summers. In Summers, this Court held that an environmental organization had standing to challenge the Forest Service's approval of the Burnt Ridge Project, because the Forest Service approved that without going through notice and comment. And that environmental organization had standing because there was some possibility that if they went through the proper process, that the Forest Service would change its mind and wouldn't approve the Burnt Ridge Project. And I think it's the same thing here. If the Secretary goes through the proper process, there is some and does negotiated rulemaking and notice and comment, there is some possibility that he will change his mind and forgive our debts. Were the procedures in Summers applied in Summers? Were they implied? I think it was... No, applied. Oh, applied. In that case, yes, the Court found it was drawing a distinction between why they would have had standing in one place and wouldn't have in another. And the reason that the group ultimately didn't have standing is because they had settled it. But the Court said that if Burnt Ridge had still been on the table, that they would have had standing. Doesn't your theory of injury rely on the assumption that if the HEROES Act isn't there or if there's a problem with the HEROES Act, the administration would necessarily have done the same thing under the HEA? No, I don't think so. In fact, I think the program will look quite different once it does go through negotiated rulemaking and notice and comment. I guess I'm asking you, you seem to be assuming that if you get the relief of invalidation of the action under the HEROES Act, that the administration would necessarily move forward because you said it was a top priority of this administration, that they would necessarily do the same thing or a similar thing, meaning provide debt relief to people under the other legal avenue. I mean, I can imagine a world, if you think of a hypothetical, in which the secretary believes that the department only has authority under the HEROES Act. Here we are in the midst of a pandemic. The intention of the department is to provide this relief in the context of the emergency and that if we don't have an emergency and that if we're not in this circumstance and we don't see the HEROES Act there, then they would not move forward. So I think you kind of have to convince us that the administration would have provided this sort of debt relief under the authority you point to that you say has the procedures that were not provided. Two responses. I think the best evidence for this is the nature of the program. The program applies to 95% of all borrowers. It's not remotely tailored to individuals who are suffering from the pandemic. And the reason is because this is a program that's just designed to help people who are in need of debt relief. And on the authority point, the parties are in agreement that they have the power to do this under the HEA, and the secretary has never come up here and denied that they won't go through the exact same process, which they should have done in the first place, once this program is declared unlawful. Except my biggest problem is you've shown me nothing to suggest that if they have to or will go under HEA, that they're going to deprive you of due process. They're going to let you be heard. What Justice Jackson was getting to is you could be heard and not accepted. I mean, your position could be rejected. Then we'd have to look at that program and decide if that program fits the HEA requirements and the arbitrary and the precarious standard. But there is no injury that you're suffering unless you get a speculative new plan that goes into effect. You have no proof that if a speculative new plan does arise under the HEA, that you're going to be deprived of notice and comment. And you certainly can't say if they rule against that interest and you've had notice and an opportunity to be heard, that it was arbitrary and capricious. So I'm at a loss as to how you have standing. Because there is no notice and procedure required under the HEROES Act. The only way you can win is if you strike down this program completely, and that means that you don't get an opportunity to be heard, but nobody else does either. The Secretary created a $400 billion debt forgiveness program. Now, you're arguing what the state's arguing. I'm asking about you. Sure. You as a student, once the HEROES Act, your $10,000 student is going to get nothing. He's not going to get $20,000. You strike it down, he gets nothing. Neither does your person who wants something. This is so totally illogical to me, that you come into court to say, I want more, I want to file a suit to get more, but I know I'm going to get nothing. So the Secretary created a massive debt forgiveness program, and he says that he's doing it one time and one time only. He said this in his brief, in his declarations, on his website, and in the reply brief he said he took cost into account. And so if we miss this shot, we will never have another opportunity to get debt forgiveness. I don't know if that hurts you or hurts you. It seems to hurt you to suggest that. I thought your argument was if we strike down this program, then we know the Secretary is going to try again under the HEA, and that's the release that we are seeking, the procedures that exist under that program. So if he's done, if we strike it down, isn't Justice Sotomayor right that you're in a much worse position by bringing this lawsuit? If he completes the program, but we are trying to stop this program so that it can go through the proper process, so that we have an opportunity to comment and urge the Secretary to forgive our debts. Right now, Ms. Brown has $17,000 in student loan debt, and she's not getting a dime of debt forgiveness. And if this had gone through the proper process, there's some possibility that we would have had our debts forgiven. And in Lujan, what Lujan talks about is this is why procedural rights are special, because the agency can always come in and say, you know what, we would have done the exact same thing even if you would have had that process. Your injuries aren't redressable. They're speculative. But that's why procedural rights are special. Do you rely, to what extent do you rely on the fact that your clients include an existing student loan borrower, and that you have a little different than one that is not? In other words, it's not speculative in the question of how would that person be remedied, but it is another borrower you're asking for notice and comment, and during that period, if it's granted, it would entitle you to raise the limit, whatever the credit limit is that should be changed. I mean, I think your challenge is to make that sufficiently particularized and non-speculative. I mean, the problem with standing jurisprudence for something that looks for something concrete and particularized, it's also very academic. You know, a dollar of injury and you're in. Hundreds of millions that they can't trace directly to the agency action, and you're not. So what is it that makes the interest of your client who has a $17,000 loan, how is that sufficiently concrete and particularized in the context of something that the government would address if it can't do what it's doing now? Sure. So I think it is critical that we're here representing borrowers. She has student loan debt, and it's not being repaid, and those are concrete interests at stake. So this is not someone off the street who is upset that his or her taxes are going to go up. There's no question that would be a generalized grievance. But here, if you look at the scope and the purpose of the program, it's to help student loan borrowers. But instead of doing this negotiated rulemaking and noticing comment, they carved up the lines and they did it all in secret. I'd point the court to page 31 of the government's reply brief. On that page, the government said that it had extensive discussions with banks and ultimately decided not to forgive FFEL loans. That's the type of thing that should be happening on the public record. Mr. Connolly, aren't you really fighting Congress on this one? The HEROES Act specifically says no notice and comment, no negotiated rulemaking, specifically says there's going to be an emergency, so we're waiving those procedural requirements. So, you know, you might think that Congress made a wrong call there, but that's Congress's call. Because when Congress wrote the HEROES Act, the waivers and modifications have to actually be authorized by the Act. You can't just label something a waiver or modification and skip through negotiated rulemaking and notice and comment. Right there, subsection D, it says the negotiated rulemaking requirements shall not apply to the waivers and modifications authorized or required by the Act. It doesn't say anything that the Secretary labels a waiver or modification is authorized or required by the Act. And so we recognize that Congress did create an exception, but the waivers and modifications actually have to apply. They have to actually be authorized by the HEROES Act. Mr. Connolly, what are the limits of your theory? Could someone who finished paying their loans off, you know, right last year sue because they were disappointed that they weren't included for reimbursement? No, I don't think so, because there's no mechanism by which the Department of Education can write those borrowers a check. And so their injuries are not redressable. Here, there is a mechanism under which the Secretary can forgive Ms. Brown's debts, forgive Mr. Taylor's debts, and that's the difference. What about the Chief Justice's lawn care person who doesn't go to college, starts a lawn care business, but as the Chief said, this person has some fairness concerns and feels like this shouldn't have happened and kind of level up or level down and wants to level down? Sure. Again, the Secretary of Education has no power to give any money to that individual or do anything like that. And so even if he could come up with a concrete interest, it couldn't be redressable. Could have persuaded him not to do it would be, I take it, with the fairness concern and the hypothetical the Chief posed you, I think it would have been to say, well, this isn't fair. You're not doing this for me, so you shouldn't have done it for anyone. But you're not taking the position that that would be an issue? No, he would not, because you have to have concrete interests. It has to be particularized. It can't be abstract. So it's not just the getting shut out of notice and comments? Correct, correct. These individuals have concrete interests. There was a $400 billion debt forgiveness program that was created, and the respondents have debts, and they're not being forgiven. And if it had gone through the proper process, negotiated rulemaking and notice and comment, we could have argued that our debts should be forgiven, too. The suggestion is not that the Secretary of Education should forgive, on behalf of different banks, loans to law and service companies. It's that that is a consideration of other Americans in a comparable situation who will not get that sort of relief that maybe the Secretary should have taken into account. And that if we had notice and comment rulemaking, that maybe that would be a consideration that would come forth. Or maybe if Congress were involved in this expenditure of $500 billion, that that might be something that they could consider. Right, and I would also point to negotiated rulemaking statute. This is a unique statute. Congress said specifically that it wanted all of the individuals who are affected by the Title IV loan process, student loan borrowers, universities, everyone, it wants them to be involved in the process. And it strengthened those requirements in 1998. And so the idea, I think, that right after doing that, really strengthening negotiated rulemaking, that Congress said, yeah, you can create a $400 billion program on your own, in secret, without any public involvement, it just doesn't seem possible. What is the limiting principle? I mean, there are many, many programs out there that people say, well, I ought to be covered by that, and I wasn't. And we certainly don't allow everybody to come in and say just because I would have a right to comment if this law were struck down, I therefore have a right to bring a suit. I mean, how is this? I understand maybe you have the one client that has a student loan and one that doesn't, right? Right. Well, there's a clear difference between those two situations, isn't there? Sorry, they both have student loan debts right now. Brown has $17,000 and Taylor has $35,000. Okay. Well, what principle should we look at to try to limit the universe of people? Because otherwise you get people who are interested in any kind of law at all. I'd have something to say that the secretary might find of interest in notice and comment, and so I should be able to sue to block what's there now. I think you have to look at the scope and the purpose of the agency action. Was the individual's concrete interest at stake? If they're doing something that has no relation to what you're complaining about, your concrete interest, then it's coming out of left field, and that person isn't going to have standing. Or if there's no possibility that the secretary is going to give you relief because we're dealing with topic A and you're coming in here on topic B, then that person isn't going to have standing. But here, there is no dispute. The secretary is trying to give release to student loan borrowers. That's the nature and the scope and the purpose of this act. And instead of figuring out, okay, among this universe of student loan borrowers, who's going to get what, how much, instead of doing that on the public record, they did it in secret first. So for purposes of standing, as distinct as to who can comment, because anyone can comment, for standing purposes, it has to be someone who is in the class of people who could have been afforded relief? Yeah, I think that's a fair way to put it. You have to have concrete interest. It has to be particularized, and that's what we have here, I think. And if I understand your theory, it's once you strike down this program, then the secretary just uses authority under the HEA. Is that the nature of your theory, which would include notice and comment and negotiated rulemaking? The HEA gives the secretary the power. But the theory is that the secretary will just switch to another statute. Well, I think that's focusing. You look at the agency action. You look at the facts on the ground of what's actually happening. But you're striking down this program. That's the whole point of your being there. You're trying to – this program is not – right? You have to strike down this program to get any possibility of notice and comment under another statute, right? Right. So you have to strike down this program, then you go under another statute, where you do get notice and comment. That's the theory. That is correct. The HEA gives us a right. They have to go through negotiated rulemaking and notice and comment. Right. I mean, usually when we give standing for procedural violations, we're talking about procedural violations within a particular program, right? We're not talking about, you know, if you have a problem with the procedures relating to one program, you can just come in and strike down the program so that you're in another statute entirely. Well, I don't think it's right to look at – to focus on the statute that they're using as an excuse. When you look at what we look at – It's a statute they acted under. Well, I – And it's a statute that says you don't have to use notice and comment. Well, I think we focus on the agency action issue. So in Lujan, the Lujan footnote 7, the agency is proving a dam. In Summers, the agency is tearing down a forest. Here, the agency is doing debt forgiveness. I think you look at the action. I would point to – Suppose there were no HEA. Suppose it was this statute or nothing. Would you then say you still have standing because once you strike down this program, you know, the secretary would go back to Congress and get a new statute? No, I don't think so. At that point, there would be no possibility that he would go back and give us relief. Well, yes, there is a possibility. He goes back to Congress and says it's terrible. Nobody can get loan forgiveness, so I'll go back and get a new statute. That relief would be coming from Congress. The way you look at the redressability is whether there's some possibility that the agency will reconsider its decision. And here, the decision was the debt forgiveness program. Keep going. I'm sorry. So you look at the agency action. And the other line of cases I would point to is the structural separation of powers cases. In those cases, you focus on the agency action. You don't look to see whether the restrictions on removal are injuring the individual. You look at whether the agency's actions are injuring the individual. And I think it's the same thing here. What's your best case, if you have one, for your answer to Justice Kagan's question about you going under a different statute? Are you aware of such a case? I guess a few responses. First, I would go back to the ones I just mentioned, Lujan and Summers. None of those cases focused on the statute at issue. They looked at the action. Lujan footnote 7, the dam example. An individual who is living next to a dam, when they approve that dam without going through the proper process, that individual has procedural right to challenge that. When the agency approves the dam, they're approving it under the Federal Power Act. When the individual is going to get relief, he's getting it under the Endangered Species Act. And I think what that footnote shows, and what that example shows, is that the statute really doesn't matter what they're acting under. What matters is the agency action. Well, let me ask you about the evidence. What evidence do you need as the plaintiff coming in, claiming standing, that the agency would have proceeded under this other statute? Because it's not a world in which they overlap so entirely that if we take one away, they're automatically in the world of HEA. They would have to actually elect to operate in that other world. And so this goes back to my very first question to you, which was about, aren't you relying on the assumption that if the HEROES Act falls, this agency or this administration would pursue the same course of action under this other statute? Sure. A few responses. First, if you look at the nature of the action, it is applying to 95% of all borrowers. It's not remotely tailored to the pandemic. Do you have evidence that they've said, even pursuant to this litigation, for example, that if the Supreme Court strikes this down, we're going to pursue the same relief under the HEA? I'm asking about the – like, what do you – is it enough for you just to identify another path? Don't you have to at least have some evidence that the administration is going to move in that direction? So, yes. So, again, I would point to the nature of the rule, that it's broad-based. It's not tied to the pandemic. The second thing I would point to is that there's all sorts of evidence. When – during the campaign, they were talking about doing broad-based debt relief. It wasn't related to the pandemic. Senator Warren and others passed resolutions urging the Secretary to use the Higher Education Act to pass debt forgiveness. Scholars have written about this. And yet the Secretary chose this path. So, I guess I'm just trying to say, do we have something from the Secretary saying that, you know, we're definitely doing this under all circumstances and we'd pick the HEA if the HEROES Act falls? I think that would be a very high burden for us to meet. Because if you look again at footnote 7 of Lujan, when it's talking about why procedural rights are special, what it's saying is that if the burden is on the plaintiff to come back and say, you know, my comments are going to be amazing, they're going to do this, they're going to change their mind, procedural rights are going to be useless. They can always come back and say – No, but that's change your mind within the context of a particular program. This is Justice Kagan's point. I mean, yes, redressability gets relaxed when we're in the world in which procedural rights would have otherwise existed. And you don't have to, as a plaintiff, show that they would have made a different ultimate determination if they'd heard your comments. We understand that. But what you're suggesting is that same principle of redressability applies to whether or not they would shift to an entirely different legal base of authority to pursue this program. And I've never seen that before. And, again, I think this program, they could have cited Section 1082 of the HEA to go under it. They believe they can do it. They've said it in their brief that they can do it. My guess is the reason why they didn't do that is because they would have had to go under negotiated rulemaking and notice and comment. And if you look at the breadth of this program, it's not about helping people who are uniquely suffering from the pandemic. It's helping 95 percent of all borrowers, except for the respondents here. And so I think when you look at the nature of the program at issue, plus the campaign statements, plus the fact that they've never gotten up here and denied it, you put all that together, and I think we have a strong, at a minimum, some possibility that they're going to get up And they go back to the drawing board. I don't think they're going to fold up shop. I think they're going to say, how about the HEA? What's your theory, if any, and maybe I should be asking the other side this, but your theory for why they didn't want notice and comment? I think because it's the negotiated rulemaking process and the notice and comment process. I mean, it's a long process. And most agencies would prefer not to have to do that. And this is an emergency. And emergency statutes typically do not have notice and comments, do they? If this were authorized by the HEROES Act, then they could have gone under it, but it's not. They could have done the good cause exception, though. They could have tried to, but they didn't, and probably because it's not an actual emergency to have to forego notice and comment negotiated rulemaking. Thank you, counsel. Oh, wait. I'm sorry. I didn't mean to cut you off too quickly. I'm sorry. Justice Thomas, do you have anything? Justice Alito? Justice Kavanaugh? Justice Barrett? Thank you. Thank you very much. General Prelogar? Thank you, Mr. Chief Justice. I want to begin with standing again. My son was asked several times whether he has a case to support this novel theory of standing. He referred to Lujan and Summers. Those cases don't support the theory he's advancing here. In every case where there has been an asserted procedural injury, the plaintiff was asking for the agency to reconsider its decision under the very statutory authority at issue. He's not been able to identify any precedent where instead the plaintiff is able to say, I acknowledge I can't get any relief under the particular agency action at issue. Instead, I'm hoping for some kind of bank shot where if I can hold up the agency in this one area, maybe it will take a different action under a different statute that will down the road provide me some kind of benefit. And that would be an extraordinary expansion of Article III injury in the context of procedural injuries in particular. He was asked whether he had a limiting principle, and he suggested, well, you have to have a general interest or stake in the subject matter of the dispute, but I don't see how that limits it at all. Go back to the cases he cited which involved environmental plaintiffs, and imagine a scenario where you have an environmental plaintiff who is interested in pollution, and the agency has decided to regulate water pollution. Now, that plaintiff doesn't actually have a stake in water pollution, isn't harmed by it, but the plaintiff thinks that if it can hold up the agency from regulating water pollution, maybe the next priority or goal will be to go after air pollution. I think that if a plaintiff came to court and pressed that kind of claim, it would be clear that it is far too attenuated and can't possibly supply a basis to allow this universe of plaintiffs to newly assert these kinds of procedural injuries or substantive injuries with respect to agency decisions that have not been made. He said that they have a concrete interest in trying to have their debts forgiven. If that were their interest, there were several straightforward mechanisms to try to vindicate it here. They could have challenged this plan as being arbitrary and capricious on substantive grounds to say, you should expand the plan to include us. Or if for some reason they really wanted to have this under the Education Act, they could have gone to the secretary and filed a petition for rulemaking and said, give us relief under the Education Act. But instead their argument here is that the secretary can't provide debt relief. That is a really anomalous way to try to vindicate an interest that they claim they have in loan forgiveness. I've been thinking of it effectively as this Rube Goldberg theory of standing where instead of taking the most direct route, you've set up this complicated route to try to get what you want, all in service of being able to smuggle in a substantive challenge to the HEROES Act for borrowers who are not hurt one bit by the secretary's decision to grant relief under that act. Finally, I want to respond to his suggestion that instead the secretary should have proceeded under the Higher Education Act here. I would think that at the very least if they were going to ask this court to recognize a cognizable Article III injury on that basis, it would be incumbent on them to explain their wholly unexplained position of why they think the secretary could do this under the Higher Education Act. My friend has suggested that that's what this program was actually designed to do, but this is a pandemic-related program. It specifically focuses on the national emergency circumstances that have had profound financial effects on student loan borrowers, and the secretary acted to try to mitigate those financial harms from COVID. That's what the HEROES Act was made for. It is a perfect fit for this kind of circumstance, and it explains why the secretary chose to provide this relief to those who were harmed by COVID, just as the forbearance policy was put into place right at the start of the pandemic similarly on those COVID concerns. And then finally, I know that we have had hours today on the legal issues in this case, but I do want to step back for a moment and focus on the stakes of this case for the tens of millions of student loan borrowers in this country who have had devastating financial impacts based on this unprecedented pandemic. Over the past three years, they have benefited from the critical relief of the forbearance policy. That's an unprecedented form of relief, but it was very much needed in this circumstance to ensure that we did not see a deluge of default and delinquency on student loan debt. And it's undisputed, my friends have not disputed, that when that forbearance policy ends, and it can't continue indefinitely, once it ends, there are going to be millions of borrowers who are in a worse position because of COVID with respect to their ability to repay their loans. Ninety percent of the borrowers covered by this plan make less than $75,000 a year, and the Secretary documented the extreme impacts that COVID had had on their financial affairs. Already, 26 million people have applied for this relief, and 16 million people have been approved to receive it. For those Americans, this is a critical lifeline to ensure that they are not subject to the severe negative consequences of delinquency and default on student loan debt. And the relief for these Americans has been held up by two student loan borrowers who don't even have standing and whose claims fail on the merits. So we urge you to reject their claims. Thank you, General. Mr. Connolly, the case is submitted.